The first case on our docket this morning is 21-10728 United States of America v. Ajayi. Mr. Ehrlich, did I pronounce that right? You did. You're on a roll this morning. I'm sure it won't last. Presiding Judge Richmond, members of the panel, and may it please the court. My name is Niles Ehrlich, and I represent the appellant Christopher Ajayi. This morning I'll discuss our concerns with the jury charge and then turn to our issues with sentencing. First I want to discuss the omission of the required element in the jury charge and the Ruan error. Before we get into that, I have a question. Yes, Your Honor. If we, this is hypothetical, assuming we think that the jury charge for counts 1, 2, and 3 were adequate, but maybe not 8, what would, how would that affect the underlying conviction and the sentence and all of that? Well, if you found 8 to be insufficient, I think the only remedy would be remand. I don't see how else we could handle that, and that would, I think, necessitate going back on the conviction, on the sentence as well. So the convictions for 1, or 2, 3, and 4 would stay, 8 would be vacated, and then it would go back for trial on that one and sentencing on... So it would definitely have been, I just want to make clear for the audience and me, that this would affect sentencing, the sentencing guidelines range. Yes, Your Honor. That's what I thought. Yes. I just want to make sure that when we're talking about this, it's clear. Yes. Okay. Thank you. I sort of forget that we have a different audience. All right. But I think the issue we have here really arises from the fact that the defendant is a pharmacist, and so he had, in some instances, permission, under certain circumstances, to dispense controlled substances. The jury charge, however, didn't account for the legal distinction between a person who could lawfully do this and an ordinary drug dealer. During the trial conference, appellant's trial counsel requested an instruction that, I'm not going to read it, but basically it said that the pharmacist filled the prescription knowing that it was not a proper one. We contend that the district court should have issued this instruction, and in Ruan, the Supreme Court agreed with us. I think it's worth remembering that in Ruan, the Supreme Court considered the case of a doctor, not a pharmacist, but I think that's a distinction without a difference here, convicted under 841. In that case, the controlled substance, then it becomes the government's burden to show beyond a reasonable doubt that the defendant knew he was acting in an unauthorized way. And this is really a paramount question here, because when we look to the jury charge in this case, there are really only three elements that the jury was asked to find. One, did appellant know he was possessing a controlled substance? Of course he did. He was a pharmacist. Did the substance match what was in the indictment? In every case, of course it did. And did he possess the substance with the intent to distribute it? Absolutely. This was a retail pharmacy. So if we don't have this Ruan instruction, the jury had to find my client guilty. Counsel, how is the instruction that you requested at trial different than the one on the, this is the first element of the conspiracy instruction? Two or more persons directly or indirectly reach an agreement to dispense and distribute and possess with intent to dispense and distribute a controlled substance outside the scope of professional practice and not for a legitimate medical purpose. That last piece is the thing that you asked for. And Justice Oldham, I think the difference is, and it really goes to what's in Ruan, is this idea of knowing. Did he know it? And when we look to the jury charge as a whole, as we must, and the government correctly points to portions of this charge that might suggest that it satisfies Ruan, but when we look to the charge as a whole, as we must, we look to the definition of knowingly in there. We look to the elements that the jury must find. I do not think we find this to be a satisfactory charge on the whole. I am not saying, and I don't think I could honestly say to this court, that there's nothing in here, there's not pieces that sort of hint at Ruan, but I think when you consider the charge as a whole, as we must, I do not think you get to a proper Ruan instruction because it doesn't, and I'm finally getting to answer your question here, it doesn't go to that really component of the mens rea, of knowing that what he was doing at that time was improper. And that's the distinction that I think matters. So it says intent and outside the scope of professional practice, not for legitimate purpose, so that's in the first clause. But then the next clause says the defendant knew of the unlawful purpose of the agreement. So that's another mens rea. And that would go to, you know, that I think to Chief Justice Richmond's point in the beginning, it would go to the conspiracy and not to the later ones, but I do think that it doesn't go as far as Ruan goes. But then there's yet another one that says that the defendant joined in the agreement willfully, that is with the intent to further its unlawful purpose. What's the unlawful purpose? Well, we just told you, it's the dispense of controlled substance outside the scope of professional practice and not for legitimate medical purpose. Sure. And Justice Oldham, I am not pretending at all that those don't exist. That would not be candor to the court. And if I've somehow made that representation, I'm going to withdraw it. I'm saying it's in there, but as we look at the charge as a whole, as we must, especially element by element, with these individual charges, I do not think we get there. Are you saying it was ambiguous? I think it's insufficient, Chief Judge. I think we just don't get there on the mens rea being sufficient to satisfy it. Well, it seems to me they conflict. I mean, because the judge did clearly say, these are the elements of the crime more than once in the instructions. But then when it said, you must find, it says something else. Well, that's true. It does not, right, and we emphasize that in our brief. You must find these three things. And those three things do not include real life. But that's only as a candidate, you can't. Yes. And as we look, that's sort of my argument, as we look to the entirety of the charge, I think we have a problem, right? If we look to just specific portions, I think we can get around it. But if we look to the whole, the charge as a whole, I think we're insufficient. Excuse me. So we have asked the court to review that. And I think in looking at the government's brief very quickly, I think one of their arguments is that there's just so much evidence that your client is guilty. And I think that it's important to remember, I understand why they wrote that, but I think it's important to remember there's quite a bit of evidence on the contrary. And I have 15 points here. I'm not going to go through them all. But the point is that I think there was evidence on both sides, and that made it particularly important to have this instruction. Was it abundantly clear to the district court that you were not, that you were not satisfied with what was being done? That, did the district court have the impression that, oh, as long as I put this language in the conspiracy, and as long as I have this sprinkled here and there, I've taken care of the issue, or was it abundantly clear that you were not satisfied? Judge Elrod, that's a great question. And I think one of the problems we suffer from here is that the charge conference was largely done off the record. And we can see that, I think, at 1192 and 1145 of the clerk's record. And the judge basically says, I've heard all your objections, I've overruled them, and they're preserved for error. But he doesn't, we don't really know. We can find that. I was curious. That didn't seem to be on the record. It isn't on the record. And it turns to our second point, and I think it's an issue when we talk about our second argument, which is about the comment on the weight of the evidence. And I hope I answered your question. I think the answer is that, is that I think it was clear to him, but we suffer on both sides from a problem of this charge being, this charge conference being off the record. And you can see that at 1192 and 1145. So I acknowledge that problem. I wish I had a better answer for you, but the charge conference was largely done off the record, and I can't tell you, obviously, what was said there. Now when we turn to our second issue, what we've argued is that the trial court erred in commenting on the evidence in the jury charge. And as I mentioned- Can I stop you one more- Of course. One other question. In the government's brief on page 32, they say that after your client's objections, the district court added an entirely separate instruction. And it said, in considering these charges, you must decide if they were prescribed for the defendant subjectively, considered to be a legitimate medical purpose, and from an objective standpoint, were dispensed in the usual course of professional practice. Who asked for that? Did the judge come up with it? Where did this language come from? I think that language came from my client's objections to it. I think you'll see that on page 279 of the record. But did your client specifically ask for this language? I don't know that it was exactly that language, Chief Judge. I don't think it was exactly that language. I think that's the language that the courts have generally relied on pre-Rowen. Well, this puts the burden of proof on the defendant, not the government. Well, I agree with that. And I think Rowen- Did you object on that basis? I cannot- I would love to tell you that I know, but it was done off the record at 11- what, 92 and 1145. And so I cannot- there is no objection on the record that I can see to that, or I would have absolutely made that. But I think your point there is a good one, and I think that it's language that the Supreme Court specifically objected to in Rowen when they said, nowhere does the statute use words such as good faith, objectively, reasonable, or honest effort. So it goes, I think, directly to that. It doesn't go to shifting the burden, but it does go to that. Now, with your permission, I'd like to turn very quickly to my next issue. Before you do, I'm sorry. No, of course. It's just very problematic because in jury charge error, you have to really specifically object for preservation of jury charge error. It's a very- whether we even consider errors in charge, there's a higher standard than other types of error in a case. And so even if we, assuming arguendo, we think that the charge is wrong, if it wasn't specifically objected to and preserved at each stage, then how can we give relief? Well, I think you couldn't, right, if it's not preserved. To me, it is preserved on pages 278 and 279 of the record. And that's the best answer I can give to you in that because the charge conference was done off the record, and I'm really just stuck. I'm just stuck with that. So we've made that argument, and I think it's preserved 278, 279. You may ultimately disagree with me, but I think it was the prudent argument to make. Turning very quickly to my second argument, the comment on the weight of the evidence, I think, again, we have this challenge of there's this sort of ambiguous objection on 277, and then the charge conference is done off the record. Now, they go through a long litany of things that might be looked at that might be considered conduct that would indicate illegal activity. That comes from Rosen. Rosen is a factual sufficiency case. It's a case where they put out nine factors. The court takes those nine factors verbatim and puts them in the jury charge. We contend that's error. The government relies on Rosen. The government relies on Armstrong. Rosen doesn't apply because it is a sufficiency case. Armstrong doesn't apply because it's a much shorter, much more concise one. We contend that it really is a Kucera and Hara-Favela argument with each one of those sort of being the poles that this argument would be on. I don't think I have the time to go into that, so I'd like to turn very quickly to sentencing, and the first argument we've made here really is that we contend that the district court erred in how it calculated the drug quantity amount, and the argument that we're really making here is a Martinez argument. Martinez, as the court is aware, is running a tobacco shop, but it wasn't just selling tobacco. It's also selling cocaine. The FBI comes in. They seize all the money. They seize the money, and they say every bit of this money can be converted into drugs. This court said no. Some of that was earned lawfully. Some of that was earned selling tobacco, which you were licensed and permitted to do. In the brief, the government's brief, they said there's lots of evidence that 80 or 90 percent of the proceeds were all from this doctor's prescription. Yeah, from Dr. Capistrano's prescriptions, but what didn't happen in the PSR and where the logic really breaks down here is that they said in the PSR that every bit of controlled substance prescriptions that were issued by this, filled by this doctor, were illegal. They did not go and say we find these illegal, we find these illegal, and the reason that happens is because in a PSR, if it's sufficiently reliable, then the burden shifts to us to make the argument and bring forward the objection. We have to do more than an objection. But the way that should have happened in the PSR in this case is for the government to say okay, we're taking the prescriptions that are from the same doctor for the same exact number of pills, for the same concentration, and we're deeming all of those illegal. Okay over here in this category, if they were filled too quickly, we're considering those illegal. Then it becomes my client's job to pull those out. I know Mr. Smith. I know Mr. Smith's prescription. I've treated him. He has cancer. He's suffering from the side effects of the drugs. He needs these pills. Okay, we take that one out. That didn't happen here. They just said the PSR just jumped to the conclusion that every single one of these was illegal, and I don't think the government can come to this court and say there is no evidence that my client filled valid prescriptions. Absent that, we have harm because it increases the sentencing level. I don't think they're contesting that. And remind us what the objections to the PSR were and what the objection during the sentencing on this very point. Sure. The objection to the PSR was a Martinez objection. They erred in calculating it by... And it was explained that it included possibly legitimate prescriptions fulfilled. I don't know that it went to that point, but they said that they just didn't define exactly what it is, and I don't have the page citation... That's in the PSR, and then what about the... It's to the objection to the PSR. Okay, right. Objection to the PSR, but then the sentencing. The sentencing, they simply heard the objections to it. It wasn't reasserted. They just discussed it. It wasn't reasserted on the record at the sentencing hearing. That's what I didn't see. Okay. I mean, I just have to tell you when that's the case, and I see that I've run out of time. I appreciate the court having us, the students of Texas A&M, and the faculty, and I'll be back in a little while. Ms. Grand? Good morning. May it please the court, Amber Grand on behalf of the United States. I'd like to start with the Ruan issue, because while my friend on the other side argued that there is a distinction without a difference in that Ruan applied to physicians instead of pharmacists, nothing could be further from the truth, and that's because of the implementing regulation at 21 CFR 1306.04. The Ruan decision addressed whether the government had to prove that a physician knew their conduct was not for a legitimate purpose within the scope of their professional practice, but the regulations have always required a pharmacist to know. They've always said that a pharmacist is only liable if they know the prescriptions are illegitimate. That's been the law for 50 years since the regulations were enacted with the Controlled Substance Act, dating back to Hays, which Mr. Ajayi cited in his objections to the jury charge. This court explained that a pharmacist is only liable if they know they are filling illegitimate prescriptions. So Ruan had no bearing on the in this case. There is no Ruan error here. And I want to clarify, there were two distinct claims raised with regard to the charge and the scope of authority. In the opening brief at page 20, Mr. Ajayi claimed he could be convicted even if he was lawfully distributing controlled substances. He was charged as a common drug dealer. The charge didn't address that he had authorization and that his filling the prescriptions had to be outside the scope of that authorization. That's the first claim. And the government addressed how the charge laid out in the first element of conspiracy, that it had to be outside the scope, and pertaining to counts eight and nine, that the third element addressed outside the scope. Because immediately following possession with intent, the jury is required to find that they possess with intent outside the scope. That's not the only place it shows up in the charge. Counsel, can I just pause you real quick? The paragraph that you're talking about right after the third element where it says to possess with intent to distribute simply means to possess with intent to deliver, transfer, etc., outside the scope, etc. Does that appear for each of the three drugs at issue? There are only two possession counts, and it appears for both hydrocodone and carisoprodol. In addition to that, you have the entire section on corresponding responsibility. That section says Mr. Ajayi was authorized to distribute controlled substances. He's registered with the DEA. He doesn't have a responsibility to assess the medical status of these patients. What he has a responsibility to do is to not fill a prescription if he knows it's illegitimate, which means not for a legitimate medical purpose outside the scope of professional authority. The charge went on at length. And the important thing here is that closing argument, Mr. Ajayi didn't have a problem with that charge. He held that charge up to the jury. If you look at the record at 1184 and 1185. Well, you can't say that because you're stuck with what you got at that point. You have to be embracing it. You can't say, well, this is wrong. At that point, it's not up to point where you can say, well, the judge told you this, but that's not really right, but I'm stuck with it. That's just not appropriate. Well, my point is the court, the, his trial counsel pointed to the charge and said, look at page 12, read that element. It requires you to find that he knew, not that he should have known, not that he must have known. If you follow this charge, you have to find that he actually knew. Right. But it doesn't mean that the charge actually says that. It means that you're arguing that that's what you believe is required at law. So I don't think you get any, any mileage out of that bar. So is there something else? Well, the government maintains that intent is replete in the charge. In the opening paragraph for each of these offenses, the charge said you have to not only knowingly and intentionally possess, but you have to intend to distribute outside the scope. That instruction was repeated in the first element for all three conspiracy counts. Page five of the reply brief appears to concede that that's the case. As for the substantive counts, the, the scope argument was incorporated in the definition immediately following the third element. That scope argument is separate and distinct from the knowledge argument. The government's position is that while Mr. Ajayi objected to the knowledge component at trial, he did not raise it in his opening brief. That issue is waived. That is a distinct argument from whether he was convicted as a common drug dealer and instead addresses whether he knew the prescriptions were illegitimate. Assuming arguendo that it is not waived or forfeited, can you please address it? Yes, Your Honor. The charge repeatedly instructs the jury that they have to find that Mr. Ajayi acted knowingly. As I've just addressed, it's in the opening paragraph for each of the counts. It's in the second element of the conspiracy counts where it specifically says he has to the illegal purpose of the conspiracy. And it's in the third element of the substantive counts. In addition to that, you have the entire corresponding responsibility instruction that twice says he's only liable if he knows the prescriptions were illegitimate. And, Judge Richman, I'd like to address your question about the subjective versus objective. I disagree that that shifted the burden of proof. It simply says the jury has to find if he subjectively knew that it was. I wasn't questioning the subjective piece of it. It was that it flipped the burden overall. To do this, you must conclude that it just flipped the burden. That it should have said the government proved that he subjectively knew? No, it has nothing to do with subjectivity. Let me get back to the language. In considering this case, you must decide whether, yes or no, the controlled substances were, one, prescribed for what the defendant forgets subjectively, considered to be a legitimate medical purpose. So that puts the burden on him to prove that I considered this to be a legitimate medical purpose. And, two, he has to prove from an objective standpoint they were dispensed in the usual course of professional practice. To put the burden on the government, the government would have to prove that they were not prescribed, they were not dispensed. That's my point. I understand. The charge as a whole, the government's position would be, especially because that paragraph came after the entire lengthy... But they didn't object to this and it's not in their briefing. I was just questioning who, did the government ask? I just want to know who put it in there and why. Not to my knowledge. I believe it was drawn from Norton, but I can certainly file a supplement to Ernie Wendt. This is not a clean charge. I mean, what was the... I do believe that the sum of the charge, though, was directed at addressing the unique facts of this case. You have authorization to distribute these substances. You have a pharmacist that on the conspiracy chart is sort of one level removed from the typical pill mill case that you would see. You can't tell me this is the first time the government's tried a case against a pharmacist. Certainly not. But the government relied on the instructions from United States v. Brown, which were approved by this court, the exact corresponding responsibility instructions. And viewed as a whole, Mr. Ajayi can't meet his burden of proving error. It's his burden to show that the instruction he offered was not only substantively correct, but was not substantially covered by the charge and additionally somehow prejudiced his ability to put on a defense. The entire trial was about whether he knew. The charge was replete with instructions about his authorization to dispense, his dispensation outside the scope, whether he knew the prescriptions were illegitimate. And so it simply can't be said on this record that the charge didn't substantially cover what was requested and that it somehow prejudiced his ability to present a defense at trial. The third issue here... Where in the charge does it say clearly enough that it's the government's burden at all times to establish his knowledge and override any ambiguity or different language? In the first paragraph for each offense when it says that he has to knowingly distribute. But that it's the government's burden. And in the elements. It says it's the government's burden. Yes. Every single time. It's the government's position that it does, that it's abundantly clear. That it uses that word, the government's burden. The charge... Does it use the government's burden? I have the charge here too. Sure. Does it ever say it's the government's burden? I mean, that's a huge thing, obviously. Right. It says you must be convinced that the government has proved each of the following beyond a reasonable doubt. And it says that for each offense of conviction. So the charge does place the burden on the government. The only remaining allegation with regards to the charge is this argument about the weight of the evidence. And there are two points to make with regards to that. First of all, that instruction has been specifically approved by this court in United States v. Armstrong. While approval of the charge wasn't the issue in that case, the court sided with approval, the fact that this was a... We don't side with approval when it's not. We just say this is what's in the record unless it's some issue. We just say that doesn't mean we approved it. Right. It would certainly be dicta, but at that... Well, it's not even dicta. It's just this is what the facts were. It's just part of the factual background. The court did say this is a previously sanctioned charge in Armstrong. Armstrong adopted the list of factors from Rosen. But what's important here is the list of considerations went to the physician in this case. The district court didn't say, didn't apply those factors to the facts of this case and didn't say how those factors would impact a pharmacist's knowing conduct. And in his opening statement, Ajayi's counsel said, The government and I agree on one thing. Capistrano was operating a pill mill. We don't contest that he was operating in an illegitimate manner. We just contest whether Mr. Ajayi knew. And so those factors going to whether the distribution of substances was legitimate was on an issue that in his opening statement Ajayi did not contest. The only issue was whether he knew. And so it wasn't a comment on the ultimate issue at trial. The opening statement has no evidentiary value. It's nothing at trial. So I don't understand what we're trying to get from that. Well, my only point is that the list of factors went to the physician conduct. And that's relevant in this case only to the extent that Mr. Ajayi was aware of that conduct because we're circumstantially proving his knowledge that this was a pill mill conspiracy. So the district court providing those factors as a framework for the jury to apply the facts of this case to the law didn't constitute a comment on the weight of the evidence. But importantly, the court said these factors are neither exhaustive nor conclusive. I'm just giving these to you as examples, but it's up to you to apply the facts of this case to the law. And as a result, it didn't constitute an improper comment on the weight of the evidence for the court to instruct the jury in this manner. Following up on a question that Chief Judge Richman asked earlier, what was going on that this is so discombobulated? Did the evidence conclude at an inopportune time and it's really late at night and they're trying to rush and people are sick or going out of town? This is just very hodgepodgey and not well documented and preserved on either side. Why is that happening here? The charge itself or the process? I want to make sure I answer your question. The process of objecting? The charge itself is hodgepodgey and then also the process of the charge and the objections and the how did this get in there? And we don't know how it got in there and it's just not very orderly. Well, the proposed charge itself laid out the basis for the party's objections. Mr. Ajayi proffered a very short corresponding responsibility instruction and the government in turn explained that they were advocating for the instruction in United States v. Brown. They provided a docket citation for those instructions and the fact that they had been approved by this court. The district court then took those considerations and said the more fulsome instruction would better instruct the jury under the facts of this case. At the conclusion of trial, he gave them opportunity to make any additional objections on the record after and I would argue that he didn't reject the Ruan. This is a framing issue. This is an omission of an element. This is how the charge covered what was requested, not whether it was covered. But we don't even know because we don't have a proper colloquy on the record with all of this where we say this is the proposed instruction I would like and this is refused. And instead I'm doing this one and I still object to that one. And all the normal things that you would have in a formal charge conference that would help us be able to trace this, I still haven't heard a reason for that. You don't know? I don't know why we have the written objections. All I know is that that's what we have and that at the conclusion of the trial, no additional grounds for those objections were put into the record. That's why we don't know the basis of why the text was bolded with regards to the list of examples. I can't speak to that, unfortunately, but I do know that the sum of the charge as a whole appropriately instructed the jury repeatedly, emphatically what the legal standard was in this case and then made it clear to the jury that they had to make that ultimate determination  In my limited time, I'd like to turn to the sentencing issues, the most important of which is likely the drug quantity question. This is an interesting case because normally in drug quantity you have issues about the documentation or you have co-conspirators extrapolating quantities. There's no dispute that with the Texas pharmacy data and with the records the government put in at trial that we have papered those quantities, so to speak. Drug quantity turned on a credibility determination. The only issue raised, and Judge Elrod, this goes to your question about the objections that were made in the district court, was when did he know? There was no claim until page 10 of the reply brief that there might have been legitimate prescriptions under Dr. Capistrano. None. That objection was not raised, it was not in the opening brief, and it's certainly not in the record. Instead, the record showed that from the beginning, Dr. Capistrano was prescribing a deadly trio of highly abused narcotics. The hydrocodone, the carisoprodol, and the promethazine with codeine. From the beginning, this trio of drugs was prescribed for the same patients, month after month, at the maximum quantity, in the maximum strength, and it was filled 350 prescriptions out of Mr. Ajayi's pharmacy alone. So the district court had to decide, in accordance with the jury's verdict, did the evidence show that he knew, and at what point did he know? And the government advocated, and the district court adopted, that he knew from the beginning. There was a discount, de facto discount applied, in that we didn't know the strength of the hydrocodone between 2011 and 2014. So over 5,000 hydrocodone pills were taken out of the drug quantity calculation and were not included in the ultimate drug quantity. Now, at sentencing, he said two-thirds would be a fair number. You should give me a discount of a third. But that's three years of this conspiracy. And he picked that number because it was the only number that got him to a lower offense level. The testimony at trial showed maximum four to six months for these pharmacists to figure out that the prescriptions were illegitimate. And discounting for four months, six months, a year, two years, does not change the offense level in this case. Neither does excising the small amount that was distributed following the armed robbery. That was the second argument made. You shouldn't hold me accountable for the drugs distributed from my pharmacy after I was shot. But the district court heard Mr. Ajayi's testimony that this phantom group of people whose names he could not recall were distributing controlled substances under his DEA registration number. And the court was at liberty to reject that testimony as not credible and to find that he was still knowingly participating at that time. Of course, the district court simply had to make a reasonable estimate. That reasonable estimate simply has to be plausible. And in this case, it turned on his credibility determination that Mr. Ajayi knew from the beginning, based on the laundry list of red flags in this case, that every prescription was illegitimate, not for a legitimate medical purpose and in the scope of usual practice. That leaves the drug premises enhancement and obstruction. For premises in this case, Mr. Ajayi claims the district court failed to consider that there was a legitimate use of the pharmacy. But that testimony was offered at trial. Mr. Ajayi testified that Capistrano's prescriptions were 15.3% of my total pharmacy sales at its height. But the government presented testimony that they were 80% of the controlled substances distributed by Mr. Ajayi and at times the only doctor that he was filling for for months at a time. So the district court heard that testimony, heard the objection by Mr. Ajayi that he had to consider the proportion of legitimate to illegitimate and rejected that that somehow undercut that this was a primary purpose of the pharmacy. The legitimate use of a premises cannot shield the illegitimate use of that premises. And the bar is not high for proving a primary purpose. Not the primary purpose, but a primary purpose. And in this case, that bar was easily met. The final issue was obstruction. The district court specifically adopted the government's reasoning at sentencing on obstruction. The government, in turn, had walked through each of the findings of obstruction, the material testimony that was untruthful at trial. Wasn't there a required finding that the district court didn't make? If he adopted the PSR in the addendum and he adopted the government's reasoning, this court's precedent says that's enough, especially where materiality was obvious. In this case, the untruthful testimony went to whether he knew that was the central issue at trial. And so the court was not required to make a rote recitation of those factors on the record and was instead entitled to rely on the PSR, the addendum, and on the government's offerings in response to the objections. Because the jury charge properly instructed the jury in this case as to both scope and knowledge, and because the district court did not improperly comment on the weight of the evidence and the district court's factual findings were well supported by the record, we would ask the court to affirm both his conviction and his sentence in all respects. Very quickly, beginning with the sentencing issues, and specifically Chief Judge Richmond's question concerning the enhancement for obstruction, I find this to be a very difficult issue because when I looked at it, I was not sure at all what the specific perjurist statements were. The court did make a finding, as counsel says, but what the court said was, quote, I agree with the government as to his, Mr. Ajahi's, testimony that it meets the obstruction enhancement. Now, under Dunnegan, I don't think this is sufficient. We don't know exactly which statements the court found to be effectively perjury. If the court's going to find something to be perjury, Dunnegan has said you need to set it out. Set out why it's perjury. But if you don't do that, at least tell us which ones it was. So you don't have to do a rote recitation, but you do need to give us, as attorneys on appeal and justices in review, tell us. It's this statement, this statement, and this statement that we find to be qualified for the two points for obstruction. But if the government says it's three statements, and then the district court says I agree with the government, then you know it's the three statements. Yeah, but I think that it was not so clear in the record that the government set out, it's this statement, this statement, this statement. And I think it's important to remember in Dunnegan that the Supreme Court explained that a person can be found guilty, they can testify, and not be found guilty of this obstruction, not have this enhancement applied to them. And because of that, the Supreme Court says, look, we need some sort of specificity so that we can go into this on appeal. And I'm not asking for a wooden or rote recitation, but I do think the court owes it to you all, it owes it to us, and it owes it to defendants, even to the government, to say what those are. I have not looked at the PSR, but when we look, what's it going to show as specificity as to those statements? General statements. It's going to basically say he got up and testified, and when he testified, it wasn't truthful because he got found guilty. Counsel, can we turn to the heart of the case? I want to talk about the three elements, and I'm looking at page 25 of your brief, and you say here's the elements that the instruction, knowingly possessed controlled substance, was in fact hydrocodone and defendant possessed with intent to distribute it. Have you omitted the paragraph that the government says was in both of the possession counts, which was the one that comes immediately after that says to possess with intent to distribute means intent to deliver outside the medical practice, et cetera, et cetera, et cetera? It looks like you've omitted that from your brief, and I think that's what's causing a lot of the confusion on the panel today. So is this paragraph, it says, I'll read it entirely just without the et ceteras. It says, to possess with intent to distribute means to possess with intent to deliver or transfer possession of a controlled substance to another person with or without any financial interest in the transaction and outside the scope of professional practice or not for a legitimate medical purpose. Does that or does that not occur immediately after the quoted language in your brief? I would – of course it occurs. Okay, great. So that's deeply troubling, and I think that's causing some of the confusion today. But what I don't understand is how is that sentence that I just read different than the proffered instruction? Because you have all this stuff about, oh, it wasn't on the record or whatever. I've read the proffered instruction from your client to the district court, and it looks identical. I don't understand the distinction between what you asked for and what this says, outside the scope of professional practice or not for a legitimate medical purpose. Sure. And I think, Judge Oldham, you've asked me this question before, and I'm sorry I didn't answer it clearly the first time. And my answer is that the specific objection is that a pharmacist billed a prescription knowing that the physician issued it outside of a legitimate medical purpose, that knowing is the distinction in my mind, and that's what ties it over to Rowan. And if I'm wrong on that, I don't think intent gets to it. And I think that goes to the end of Rowan, where the court says there are these different words that are not included in the statute, and they are not sufficient. I do not remember if intent is there, but this objective stuff, all of these other things are there. But if the objective is not in this. I understand that. And this comes straight out of the implementing regulation that applies to pharmacists. I understand that. So is the argument that the regulation is unlawful because it violates the statute? No. The argument is simply a mens rea argument here, that to do it requires, if you're permitted to dispense a controlled substance and that's established in court, then the government has a specific burden, whether you're a pharmacist or a doctor. And that specific burden is to show that you did it knowing that it was done in an unauthorized manner. But if you intend to do it outside of the scope of professional practice or not for the legitimate medical purpose, that means that either you knew the physician didn't do it or you're outside of what the physician did, you're doing it. So, I mean, I don't understand how that doesn't cover the statute. And, Chief Judge, I see I've run out of time. May I answer your question? And, first, I'm sorry if I didn't include that as carefully as I should have. That is an omission on my fault, and I apologize. But to my answer, the only answer I have is that knowing is a higher burden here and that the intent doesn't get us there. So with that, I thank the students of Texas A&M, the faculty, your honors, and opposing counsel. Thank you.